Thank you. Good morning. Ben Coleman from Mr. Mayer. What I plan to do, unless the court has a different preference, is take the issues in the order that they were briefed. I'll probably mostly focus on the first and second issues. Before getting to those, I just wanted to say one thing about the standard of review. The government concedes that we're talking about a de novo standard of review, but they say in their brief that, I guess, the record should be sort of reviewed in a light most favorable to the government. And I just wanted to refer the court to one case that I did cite in the briefs, but not for this proposition, and that's Boy Scouts of America v. Dale, which is a fairly recent Supreme Court case. In particular, at page 648 of that opinion, the Supreme Court says that because this is a First Amendment case where the ultimate conclusions of law are virtually inseparable from findings of fact, we are obligated to independently review the factual records. So I think, really, this court is looking at a completely independent review. With that being said, I'll start off with the first issue. In his well-respected treatise on criminal law, Professor LaFave has said that dismissal for outrageous governmental misconduct is warranted where overreaching governmental inducement overlaps with concerns for First Amendment freedoms, such as when the government sends provocateurs into political organizations to suggest the commission of crimes. It's our position that that's exactly what we have here. And Professor LaFave's reasoning was cited with approval by the Supreme Court of New Mexico. I think, at this point, the court is, with the exception of Judge Hall's opinion in Aguilar, which I'll address in a second, I think the court is riding on somewhat of a blank slate with respect to this court's precedent, but it's our position that that's what occurred in this particular case. The district court found that NAMBLA is an organization protected by the First Amendment. That finding was in accord with the Second Circuit opinion, and the government does not challenge that finding on appeal. So we're talking about a political organization that's protected by the First Amendment. It's our position that what the government did in this case is they sent an undercover agent into that political organization. That undercover agent successfully suggested that the members commit a crime and basically got the whole crime to occur. What the FBI agent did is a month, what the FBI did is a month before the 2004 NAMBLA conference, the FBI began to create a website for a phony travel agency called Green Iguana Travel. That occurred a month before the conference. That website was not a criminal enterprise, was it? It was a commercial entity of some sort? Absolutely, but what it shows is that the FBI's intent was to go into this organization and suggest that they take part in this particular criminal act. This wasn't just something that occurred on the spur of the moment during the conference. The FBI had a preconceived plan designed at least a month before the conference to go in with this phony travel agency and this phony travel agency website and to suggest this particular trip. That's what that shows and that's an indisputable fact that the government undercover agents specifically testified that they started creating... Was the agent investigating NAMBLA or just individuals in NAMBLA? The government argued below that specific point and the district court accepted that argument in reference to my argument that there should have been reasonable suspicion before they went in. It's our position that first of all from a factual perspective that the FBI was investigating NAMBLA. If you look at every critical stage in this over three year investigation in this case, I think the facts are clear that the government was investigating NAMBLA. I'll start off at the beginning in 2001 when the agent first joined NAMBLA he wasn't investigating any individual in NAMBLA. He claimed he joined to help his investigation to some other travel agency. He wasn't investigating any member of NAMBLA. For two years from 2001 to 2003 he stayed as a member of NAMBLA yet he wasn't investigating any particular individual at all. Does it matter when you have an organization that says two or three hundred members and 170 of them are incarcerated for sex crimes? Does that matter? Well first of all I disagree with that premise that there were 170 members that were incarcerated but I think that could be a fact to look at in the reasonable suspicion analysis. But those individuals that he claims were members they were people that were part of the prisoner correspondence program that the NAMBLA was sending Christmas cards to people who were in prison admittedly which they advertise on their website to help people that maybe are in there because of the crimes that they've committed. And I think we all know that prisoners who are in there with those types of crimes receive special treatment or hostile treatment when they're in custody and that's what that program was all about. In this case as far as individuals that were under investigation the government didn't name an individual at all until 2003. The first individual that was ever mentioned as potentially being under investigation was an individual by the name of Joseph Power. Now the only information that the government had about Power in 2003 was that he had been paroled in 1994 almost ten years earlier. I don't know when the actual date of conviction was it's not clear from the record. The conviction could have been 15, 20 years old but he was paroled almost ten years earlier. The government had no indication that Power was engaging currently engaging in any criminal activity. And then when the agent infiltrated the 2003 conference he specifically testified that he interacted with Power and Power did not indicate at all that he was engaging in criminal activity. As far as whether they were investigating an organization versus individuals, before they went into the 2004 conference the FBI lead case agent wrote a memorandum where he said, FBI San Diego has opened the case to determine the extent if any of Nambla's criminal activity. He specifically said that in a report and in a sworn affidavit the FBI specifically admitted that before the 2004 conference before they went in they were not investigating any specific individuals. That was in a sworn affidavit submitted by the FBI. Would it be different if a private citizen, you know there are these citizen groups that, well, that you know victims or survivor citizen groups that decided that they, you know apart from the police were going to infiltrate and then at some point that they learn of something and then they contact the authorities and say well so and so in Nambla said that they're, you know that he's going to Thailand or you know this that and the other. Would that be a different situation than this? I think so. If they weren't working with the FBI beforehand. I mean obviously at the point that if the FBI continued to use that person as an operative then there would be a different argument. But private citizens could do this if they chose to? I believe so. I don't think there would be a First Amendment claim that the government was interfering with the First Amendment in that particular hypothetical. On the outrageous government conduct point, if you're still on it, was there any coercion here? The record seems to indicate that Mr. Mayer paid his own money. He knew what the purpose of the trip was. He was totally willing. I don't see much in the way of deception or pressure or what have you. I think, well with respect to the First Amendment claim, it's not so much that he was pressured into doing it. I don't think that's the argument. The argument is that the FBI suggested or instigated the criminal activity. They induced it which I think is conceded. And the FBI agent when he went into the conference specifically said this is the most paranoid group of people I've ever been around. We should form a travel group. I mean I'm careful but let's go. He said that. Then the FBI with their phony website contacted the members and said here's the website. We should go on this trip to Mexico. They planned everything. I mean they instigated the criminal activity. And I guess the point is with respect to the first Well that's your contention. What they did literally was to set up a phony travel agency in effect or a website at least. Right. And then they told the members this is the website. It'll arrange a trip to Ensenada, Mexico for us. It costs like 600 bucks or something like that. You'll get four days and an incredible price. You'll get four days and four nights. And the boys, they did everything. I mean they instigated the criminal activity here. You're suggesting that in fact all of these arrangements with potential arrangements with young boys was already done. That's not true. That was the assertion in the website wasn't it? The FBI agent sent an email to the members saying that this $600 or $800, I can't remember which one, takes care of everything. It takes care of the food, the lodging, the transportation and special friends in quotes. Which I think we all know what he was trying to say there. So that everything was taken care of, would have been taken care of through this phony travel agency. And so it's our position that this case comes right under Professor LaFave's rule. It governs here. So I think the first question is, is this court going to adopt Professor LaFave's rule? Obviously this court is not bound by Professor LaFave, but I believe that it is a wise rule. I think it is the correct rule. It was cited with approval by the Supreme Court in New Mexico. And ultimately I think it is consistent with Judge Hall's opinion in Aguilar. I mean Judge Hall's opinion in Aguilar says that there are two restrictions on the use of undercover informants to go into First Amendment organizations. One is that the investigation has to be conducted in good faith. And the second is that the investigation, the undercover agent has to scrupulously adhere to the scope of the invitation to take part in the organization. In this case, it's our position that if an FBI agent, assuming he has sufficient cause, infiltrates an organization, if he's acting in good faith, he does not instigate the criminal activity. He sits. He observes. He looks. He sees whether people are engaged in a criminal activity. And if he sees a criminal activity, he can make an arrest. Right. At this point, there's not a binding legal authority that there be reasonable suspicion, right? Correct. And so the government's position is that that's not required. But secondarily, they're saying even if it were, they have it here, right? Correct. But your position is it is required. It should be required. That's my position. And with respect to the second point, I did say this in the briefs, but it was kind of tucked in there. What I think the court should do, if the court determines that suspicion was required, is send the case back to the district court for a finding as to suspicion in the first instance. Because the district court never made a finding on that. The district court agreed with the government that no suspicion was required. So if the court agrees with me that I believe the standard is probable cause. But whether it's probable cause or reasonable suspicion, whichever one the court determines, if you agree with me, I would suggest the most appropriate thing would be a remand back to the district court to make a finding in the first instance as to whether there was adequate cause to infiltrate the organization. So I just wanted to make sure that that was clear for the court. So it's our position that the court should adopt the LeFauvre rule, that it's in accordance with Judge Hall's opinion in Aguilar, that it is not a good faith investigation when the FBI, the government, takes it upon themselves to create the criminal activity in this type of situation. The First Amendment is entitled to breathing room, as the courts have repeatedly said. And that's not the type of breathing room that a political organization should get in this particular context. And if there are no other questions, I'll save the remaining time. I do so, counsel. Thank you. We'll hear from the government. Good morning, Your Honors. Ann Perry on behalf of the United States. In this case, the district court correctly found that the FBI was investigating individuals who attended the NAMBLA conventions. It started off, as Mr. Coleman has pointed out to the court, with an agent who simply joined the NAMBLA organization. He joined it on a publicly available website. He sent a money order to a post office box, and he joined. He received solicitations from NAMBLA. He received invitations from NAMBLA to correspond with members who were in prison. He simply behaved as any other NAMBLA member would. And he joined, as he testified before the district court, and is replete in the record here, because he was involved in another investigation. That investigation didn't pan out for whatever reason, be it legal, be it... Well, I think, you know, I guess from the standpoint of, you know, the Nazis used to be everyone's worst group. Now, I think if a group could be less popular, it would be NAMBLA. And so, you know, how do you balance in terms of protecting the First Amendment rights of a group that is, I mean, so unpopular? Well, first of all, Your Honor, in this case, because they had no restrictions on who could join. So he certainly could. And in terms, I don't think the court needs to decide... You don't have to be accepted? No. All you had to do was send in your $35. And that's what happened here. And that's what happened for approximately two years. And then he was invited to the convention in 2003. And there were some indications that this individual, Joe Power, would be there. Not only was he a registered sex offender, but he was known to the undercover agent, Mr. Hamer, because he'd actually been sued by a family in connection with his affiliation with NAMBLA because a young boy had been killed. It was the Curley family. And so not only was he associated with that, he attended the NAMBLA meeting, knowing that there would be somebody there of interest to the FBI. And he met other people while he was there. He also learned something else. It is true that the district court accepted the proposition, and it's in published decisions from other courts, that NAMBLA considers itself a First Amendment protected organization. However, what the agent did learn at that 2003 convention, which is also in the record, is that there's no discussion of politics in the NAMBLA convention. They discuss privacy. They discuss not being caught. They discuss what to do if the FBI comes to your door. He also learned at that 2003 convention that not during the meetings, not during the meetings, but during the breaks and during the meet and greets that take place, this is when people talk about illegal activity with children. You have to be invited to the convention, though, right? If you have to be invited to the convention, apparently it takes X amount of time. And he was. And when he went, he actually had at least one specific individual. He was automatic after being a member after a certain amount of time. Is that what you're saying? Correct. And so there was at least one target there. Now, as a target, perhaps Mr. Power didn't pan out, but there were other individuals there who discussed their illegal activities with children, among them being Jeffrey DeVore. That became a subject of much debate in the motions later on before the district court. But at the time that Mr. Hamer then left the 2003 convention, assuming for the sake, again, he had individuals, he had already identified individuals who had talked about their illegal activity. He then goes back to Los Angeles. He gets transferred to San Diego. 2004 rolls around, and he gets again invited to the 2004 convention. Mr. Coleman is correct. There was a website established. It was called the Green Iguana Travel Agency. All it was was a website. That's all it was. And the record will show, Your Honors, that at no time was that website, was that travel agency, anything mentioned during the course of the 2004 NAMBLA meeting. It only was dealt with because it was under construction or whatever. The only time it was even referred to, Mr. Mayer and the co-defendants in this case, was well after the meeting when the actual discussion of going to Mexico to have sex with children was being discussed. So it really wasn't a situation where the agent was going in to forward the idea of the travel agency. He didn't. That's the fact. He just didn't. Is reasonable suspicion required at any point up to now? No, Your Honor. But even if it was required, it was here. Okay. And that is something. What is your theory on the reasonable suspicion? Based on the fact that he's already been in touch with members of this agency now for three years. He has gone to one conference, which inside the meeting says, we don't like illegal activity. This is a political organization. And then he finds out they don't do any political activity. All the members outside talk about having sex with little boys, which is illegal in all 50 states. So he has reasonable suspicion in going to that 2004 convention, as the district court found that he would see individuals again who would be discussing illegal activity. And, indeed, that's exactly what happened. Reasonable suspicion is not the standard, but it was here nonetheless. So it's not based entirely on Mr. Power. It's based on the observations made in these breaks during the meetings. Absolutely. Absolutely. And that's where all these things were discussed. Additionally, of course, the United States does not find that this was outrageous governmental misconduct. The Ninth Circuit law is replete with instances where, particularly the Esch case, indicated that it is permissible for government agents to provide a conduit for interstate activity as long as the defendant is predisposed to make it. And as Judge O'Scanlan noted, at no time were any of the defendants in this case not predisposed. The discussion of — I'm feeling left out. I have no opinion in this case. We already cited a Judge Hall and a Judge O'Scanlan. And I'm very sorry. I would have tried to find one if I could have found one, Your Honor. But in this particular case, the participants were more than eager to come out to San Diego on what they believed to be a trip to Mexico. And Judge O'Scanlan is also correct. There was no trip to Mexico. The arrest took place outside of their hotel room. So it was not the instigation of some horrible crime in the Republic of Mexico. It was simply providing individuals who are already predisposed to commit a crime with the opportunity to come to San Diego and do it. And if there are no further questions. No further questions, Counsel. Thank you. Mr. Coleman, you have some reserve time. I want to, first of all, articulate the two legal claims and then go through a lot of the facts because I think that there's, just Ms. Perry has kind of jumped over a lot of facts. And I want to try to take them in chronological order because I think it would be helpful. First, there are two separate legal claims. I guess if you want to take them in somewhat of a logical order, the first question is, does the FBI, does the government need any level of suspicion before they infiltrate a First Amendment organization? If the answer to that question is yes, then the next question is, was that suspicion here? Ms. Perry had said that, I think she had indicated that district court found that there was that suspicion here. The district court didn't make any finding on suspicion. The district court just found he didn't, Judge Miller didn't believe that any suspicion was needed. So that's the first question. If the court concludes either, number one, that no suspicion was required, or number two. So are you saying that just to send the money in and fill out from the something that anyone could do, that requires reasonable suspicion? I don't think the court has to answer that question because I think infiltrating the conferences, the annual conferences. You asked me to answer it. I don't think you'd like my answer. So that's the. Even assuming that the suspicion wasn't needed there, it was at least needed when they infiltrated the conferences. When they went in with undercover video and audio equipment. When they videoed everything that everybody was saying. When they took down the personal information of all the members and sent them to the FBI throughout the country and naming them as persons of interest. You should be looking for so and so. He's this year's old. He looks like this. This is his background information. That's an infiltration, in my opinion. And at that point, some level of suspicion is needed. So the first question is, was suspicion needed? If the court finds that, yes, it was, the next question is, was that suspicion here? And I'm going to get to all those facts in a second. But if the district court did not make a finding as to that. So my, I think, preferred course would be to send the case back to the district court to make a finding as to whether there was reasonable suspicion or probable cause, whichever standard the court were to determine. Now the government says the target was Mr. Power. Correct. Wouldn't that be enough to establish a reason for going to these meetings? It's our position that, number one, both legally and factually, it wasn't enough. Factually speaking, the target was Power. They say that. But then the question becomes, well, what did they know about Power? The only thing they knew in 2003 when they went to that conference was that he was paroled in 1994, nine years earlier. That's the only knowledge they had of any criminal activity on his part. They didn't have any. Well, plus the conviction, of course. Well, they had the conviction, which we don't know whether the conviction was in 78 or 84 or when it was. But we know he was paroled in 94, nine years before the end of the conference. They had no indication at all that he was engaged in any criminal activity. That's number one. But number two, even assuming it was Power, and even assuming they had suspicion as to Power, the question becomes, can the government infiltrate a protected First Amendment organization, the entire organization, just because they have suspicion as to one individual member of the organization? It's like saying, can the government go into a mosque or an Islamic place of worship because they have maybe belief that one member of that church is involved in some type of activity. It's our position that simply having suspicion as to one member, which we don't think they had in this case anyhow, does not authorize the government to infiltrate an entire organization. And that was discussed in one of the law review articles that we cited. So that's the first legal issue. Then the second legal issue is let's assume the court finds that either, number one, no suspicion was required, or, number two, that suspicion was required but they had it. Although I think if the court determines that suspicion is required, the better course would be to send it back for findings. But if the court makes that determination, there's a second independent legal issue, which the government continues to refuse to address. And that is, if it's permissible to go into a First Amendment organization to infiltrate one, can the government then go ahead and instigate the criminal activity? That's a separate independent question. If they're there permissibly, let's assume that he was and the FBI was there permissibly, can the government take the next step and instigate the criminal activity? Can they go into a pro-life organization and suggest obstructing abortion clinics? Can they go into a group that advocates legalization of marijuana and suggest distributing marijuana to cancer patients? Can they go into a Islamic place of worship and suggest making donations to organizations that are affiliated with terrorism? Can they take that next step and instigate the criminal activity? And it's our position that under Lefauve and under Judge Hall's opinion in Aguilar, which sets a good faith standard, that the answer is no. And in this case, they instigated the criminal activity. The government just wants to ignore the fact that at the conference, the FBI agent said to them, this is the most paranoid group of people I've ever been around. We should form a travel group. I mean, I'm careful, but let's go. We should form a travel group. He says that at the conference. Then he sends the e-mail to the members saying, I've got this website with this travel agency. It's 600, 800 bucks or whatever it is. You go down to Mexico. The boys are included. The food is included. The transportation is included. The lodging is included. The government instigated this criminal activity. There's no getting around it. And they created, they started creating that website a month before the convention, which goes to show that this was their plan. This wasn't something that came up after the fact. Ahead of time, they were targeting the members and they wanted to instigate this criminal activity. And the facts are clear as to that. So those are really the two, I think, legal issues that the Court needs to struggle with. What did the government do to interfere with what would be the First Amendment lawful activity of the organization of NAMBLA? Well, besides instigating. I mean, because the way that my understanding is that they set themselves out is that they are a group that's working to legalize, you know, to eliminate the underage consent requirement, which is something that you can do. I mean, if you want to, you know, that you can actively, I mean, right. But, you know, if they had written up there that our purpose is to have sex with young boys in violation of the law, that wouldn't have the same First Amendment protection. Correct. So what did the government do to interfere with that portion of what is their First Amendment exercise? Well, the government did several things to interfere. Number one, they instigated the criminal activity and then arrested people. That's number one. Number two is the agent offered to host the 2005 Convention, which then they made the arrest. And obviously, they could never – they never had a 2005 Convention because the agent offered to host it, and he was an undercover FBI agent. So that's the second thing. He surreptitiously recorded – although this organization keeps its membership confidential – he surreptitiously recorded the entire proceedings, the entire meetings, and distributed names throughout the country. He wrote privacy policy for this committee. He drafted a memorandum for the Privacy Committee to try to establish the privacy agenda for the committee. He made inappropriate remarks at the 2004 Conference, suggesting that he was the head of NAMBLA's international prostitution ring and was reprimanded for making those types of comments. I mean, he became a part of this organization. He attempted to get involved somehow in the direction of the organization, at least as to the Privacy Committee. And the bottom line is that, number one, agents – I mean, I think any political organization, if there's no basis to believe or not adequate basis to believe that they're engaging in any criminal activity, they should be free from having undercover agents infiltrate and video what they're doing, collect information about the members. It's like collecting a membership list, which the Supreme Court has held requires probable cause in Gibson. And that's what he was doing here. He was collecting information about everybody in attendance. He was writing down the background information. I mean, that's the other thing. The government says that they were investigating power. Well, they go to that 2003 Conference. They video everything. They write down the personal information of everybody in attendance and then send that information out to FBI field officers throughout the country. That doesn't sound like investigating one individual. That sounds like you're collecting a membership list of the organization and making these people targets for the FBI around the country. Thank you, Counsel. Thank you. The case just argued will be submitted for decision, and the Court will adjourn.
judges: Hall, O'scannlain, Callahan